UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

No. 14-2314
_____

UNITED STATES OF AMERICA,
Appellee

v.

JOHN J. O'BRIEN,
Appellant
_____

**MOTION FOR RELEASE PENDING APPEAL
AND SUPPORTING MEMORANDUM**

Pursuant to Rule 9 of the Federal Rules of Appellate Procedure and 18 U.S.C. §3143(b), appellant John O'Brien requests that this Court order his continued release pending his appeal of the judgment of conviction entered in the United States District Court for the District of Massachusetts (Young, D.J.) on December 9, 2014, under the same conditions imposed for his release pending trial and pending his self-reporting date.

In support of this motion, and as set out in the memorandum below, appellant states the following:

1. There is clear and convincing evidence that, if released pending appeal, he is not likely to flee or pose a danger to any person or to the community;

1

2.  The appeal raises a substantial question of law or fact which, if determined favorably to appellant, is likely to result in reversal or an order for a new trial on all counts on which imprisonment was imposed.

## MEMORANDUM IN SUPPORT OF RELEASE PENDING APPEAL

## I.    INTRODUCTION

After forty days of trial and jury deliberations spanning seven days, John O'Brien, the Commissioner of Probation in the Commonwealth of Massachusetts from 1998 – 2010, was convicted of racketeering conspiracy, racketeering, and four counts of mail fraud for his involvement in what the government characterized as a scheme to defraud by hiring and/or promoting persons recommended by members of the Massachusetts legislature for positions in the Massachusetts Probation Service[1] when those sponsored persons were not the "most qualified" applicants. [2]  The government alleged that the Probation Service was an "enterprise" being conducted through a "pattern of racketeering activity" consisting of mail fraud offenses under 18 U.S.C. §1341, requiring tangible harm, based on the use of the mails to send letters.  The purpose was to curry favor with

---

[1]   While the government refers to the "Probation Department," it is officially called the Massachusetts Probation Service and will be referred to as such in this memorandum.

[2]   O'Brien was acquitted of four counts of mail fraud; two counts of mail fraud were not submitted to the jury.  Charges alleging bribery concerning a program receiving federal funds were dismissed on motion of the government after trial.

legislators who funded Probation's budget.  *See* Second Superseding Indictment

("Indictment") appended as Attachment "A").

The government did not allege that O'Brien received any money for hiring

any particular individual.  The government did not allege that any of the persons

hired were not qualified for the position.  Nor did it articulate how the "most

qualified" person would be determined or who that person would be for any

particular position.  In short, the government alleged that O'Brien participated in a

political patronage system, a system which, at sentencing, the district court

recognized did not begin with John O'Brien:

> What we have here, in this Court's considered judgment, is
> fundamentally decent people utterly without a moral compass at sea on a
> field, a wash of political patronage, and old history is important.
>
> John O'Brien didn't invent patronage hiring in the Department of
> Probation.  There was a time when judges made the decisions and that
> time goes back to when there were individual line items for each of the
> individual courts, save for the Superior Court, which gave it some
> immunity,  And  it is clear that in that time, going back to those times,
> which predate his appointment, there were situations where to advantage
> the budget of individual courts there were appointments made to receive
> favorable treatment from the Massachusetts legislature or individual
> senators and representatives.  And then there came a time when budgets
> were centralized, a wise and important reform, and hiring was likewise
> centralized in the case that's important to our situation, in the office of
> probation, but what that had the effect of was simply centralizing the
> patronage in the hands of the House and Senate leadership.

Transcript of Sentencing Proceedings, November 13, 2014 ("S.Tr.2"), p.75-76

(Attachment "B").  As the district court had instructed the jury, patronage, defined

3

as "getting a job or a promotion or a government benefit based upon who you know rather than what you know", is not a crime (excerpt from jury instructions, p.24 (Attachment "C")).

In the absence of any law that would criminalize patronage directly, the government predicated its case upon the alleged violation of hortatory language in an internal state trial court hiring manual that purports to require "merit" hiring of the "most qualified" candidates, without supplying definitions of those terms. In so doing, the government would extend the reach of the mail fraud statute into uncharted territory after the Supreme Court's decision in *Skilling v. United States*, 130 S. Ct. 2896 (2010). The only other case that even comes close is *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), arising out of patronage hiring in Chicago. There, however, federal litigation over hiring practices that began in 1969 led to a series of settlements and judgments that collectively came to be known as the "Shakman decrees." These decrees put everyone on notice, over the course of decades, that political influence was prohibited in the hiring of city workers. Patronage in Chicago was illegal as a matter of federal law. Here, in contrast, the defendants could scarcely imagine that federal prosecutors might one day wield fraud and racketeering statutes to second-guess their hiring decisions.

## II.     STANDARDS FOR RELEASE PENDING APPEAL

18 U.S.C. § 3143(b)(1) provides, in pertinent part, that:

a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal or a petition for a writ of certiorari, [shall] be detained unless the judicial officer finds –

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in–

    (i) reversal,
    (ii) an order for a new trial,
    (iii) a sentence that does not include a term of imprisonment, or
    (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process.

*See also United States v. Bayko*, 774 F.2d 516, 522 (1st Cir. 1985).

Section (b)(1)(B) sets out two requirements for release: "(1) that the appeal raise a substantial question of law or fact and (2) that if the substantial question is determined favorably to defendant on appeal, that decision is likely to result in reversal or an order for a new trial of all counts on which imprisonment has been imposed." *Bayko*, 774 F.2d at 522. A substantial question is "a close question or one that very well could be decided the other way." *Id.* at 523 (internal quotation marks omitted). Such a question is likely to result in reversal if the "claimed error" is not "harmless or unprejudicial." *Id.* This Court has explained the standard of review on bail determinations as follows: "while the court of appeals should give

5

deference to the decision made by the district court, it should nonetheless make an independent determination of the merits of the bail application.  *Id.* at 519.

As set out below, O'Brien meets these criteria for release pending appeal.

## III.  MR. O'BRIEN MEETS THE CRITERIA FOR RELEASE PENDING APPEAL.

John O'Brien was released on conditions prior to trial.[3]  His release was continued after trial, through sentencing, and has been continued following his sentencing to permit self-report to the institution designated by the Bureau of Prisons for service of his sentence on January 12, 2015.  However, the district court denied further release pending appeal.  *See* S.Tr.2 at 73.  At the end of the proceedings, the district court confirmed that it was denying release pending appeal and that denial was its final order.  S.Tr.2, p.77.  The district made a subsequent docket entry confirming this ruling. Docket Entry # 702 (entered November 24, 2014) ("The sentences imposed herein shall not be stayed during the pendency of any appeal.").

### A. Mr. O'Brien Presents No Risk of Flight or Danger to Others

Mr. O'Brien does not present a risk of flight.  He has no criminal record, much less a record of violence.  The offenses for which he stands convicted do not

---

[3]  Mr. O'Brien was released on $25,000.00 unsecured bond with, *inter alia*, the following conditions: reporting requirements; passport surrender; travel restrictions; residential restrictions; and firearm and dangerous weapon prohibitions.

involve violence or the threat of violence; he presents no risk of danger to any

other person or to the community.  The court did not deny release pending appeal

beyond the self-report date of January 12, 2015 on a finding of risk of flight or

danger to others.  *See*, p.73.

### B. The Appeal Raises a Substantial Question of Law

### 1. The District Court's Assessment of the Case is Flawed

The district court concluded that notwithstanding the complexity of the

indictment, it became "a rather simple case":

> Complex as this case was under the indictment, it sorted itself out as it
> went on and in the main it is a rather simple case.  The only – simple in
> the law.  The only new legal aspect is the use of the gratuity statute and
> even if that aspect of the case were to be overturned, it would not
> overturn the conviction nor would it affect the sentence. So there's no
> reason to stay it.

S.Tr.2, p.73.

Mr. O'Brien suggests that it is not so simple.  The government's efforts to

shoehorn political patronage hiring with no quid pro quo payments for jobs into a

RICO and mail fraud prosecution, and issues arising during the trial of this case,

created a number of substantial legal issues.  In this motion, appellant will focus on

the mail fraud counts, which also impact the RICO counts in which the mail fraud

allegations were charged as predicate acts of racketeering,[4] and the predicate acts alleging violation of the Massachusetts gratuities statute.

Mr. O'Brien also adopts arguments set out in the motion for release pending appeal filed by his co-defendant Elizabeth Tavares in case no.14-2313. The arguments, addressing the questioning of witnesses by jurors (Tavares motion pp.8-20) and certain jury instructions (Tavares motion pp.21-23, 26-27, 29-32) apply equally to him.

In addition, as argued below, the district court's treatment of the RICO conspiracy and alleged bribery/gratuity racketeering acts constituted a prejudicial variance from the conspiracy charged in the indictment. *See, e.g.,* Docket Entry # 636 (O'Brien Motion for Aquittal or, in the alternative, for a New Trial) . However, due to the record-specific nature of the argument and the size of the record, Mr. O'Brien does not discuss that issue here.

---

[4]  The Indictment describes 22 alleged instances of mail fraud in violation of 18 U.S.C. §1341 as part of the alleged "scheme to defraud" relating to the hiring or promotion of a Probation employee. The employees are identified by initials, and the allegations follow the same pattern: the individual was "sponsored" for a job at Probation, was not the most qualified candidate, was hired or promoted, and something (usually rejection letters) was sent in the mails. The racketeering conspiracy charged in count 1 alleges that the pattern of racketeering activity included, *inter alia*, these 22 hiring decisions. These 22 instances are also charged as racketeering acts 1-22 in count 2. Counts 3-12 of the indictment charge ten of these hiring decisions as substantive counts of mail fraud in violation of 18 U.S.C. §1341.

### 2. The Indictment Failed to Sufficiently Allege the Charged Mail Fraud Crimes

Mr. O'Brien moved to dismiss the indictment, including the mail fraud counts, prior to trial, asserting, *inter alia*, that the indictment failed to sufficiently allege the charged mail fraud crimes. The district court denied that motion. *United States v. O'Brien*, 994 F.Supp.2d 167 (D.Mass. 2014). O'Brien maintains that his challenge to the indictment raises a substantial question of law supporting release pending appeal.

### a. Mail Fraud Elements

"The elements of mail fraud are: (1) devising or attempting to devise a scheme or artifice to defraud; (2) knowing and willful participation in the scheme with the specific intent to defraud; and (3) the use of the United States mails in furtherance of that scheme." *United States v. Stergios*, 659 F.3d 127, 132-33 (1st Cir. 2011). The government must prove that the defendants had the "specific intent" to defraud, "which excludes false statements honestly believed to be true and promises or predictions made in good faith." *United States v. Mueffelman*, 470 F.3d 33, 36 (1st Cir. 2006). The alleged fraud must include a "misrepresentation or concealment of *material* fact." *Neder v. United States*, 527 U.S. 1, 22-25 (1999). Section 1341 penalizes mail fraud aimed at depriving someone of money or property; it does not criminalize the deprivation of intangible rights. *See Skilling v. United States*, --- U.S. ---, 130 S.Ct. 2896, 2927 (2010).

9

### b.  The Charges in This Case

The Indictment in this case alleged:

> That the defendants and their co-conspirators did: (1) cause those
> individuals set forth below to be hired and promoted when they were not
> the most qualified candidates; (2) provide materially false documents to
> the CJAM to make it appear that those individuals were the most
> qualified and were hired pursuant to a merit-based system; and (3) use
> the United States Postal Service as well as private and commercial
> interstate carriers to deliver rejection letters to other unsuccessful
> candidates and to receive and deliver other documents related to
> employment with the enterprise."

Indictment Counts Three through Twelve, par.2.  The CJAM is the Chief Justice

for Administration and Management, who oversees the trial system of the

Commonwealth of Massachusetts (Indictment, Count One, par. 1).  The mailings at

issue in the substantive mail fraud counts were all rejection letters (Indictment,

Counts three through Twelve, par.2).

According to the Indictment, the CJAM had oversight responsibility over the

Office of the Commissioner of Probation (Indictment, Count One, par. 1); the

Administrative Office of the Trial Court (AOTC) had a merit based system of

hiring governed by statute and a Personnel Policies and Procedures Manual of the

AOTC for all employees, including those within the Probation Service; and the

Commissioner of Probation appointed probation officers subject to the approval of

the CJAM (Indictment, Count One, par. 5).[5]  The indictment alleged that in order

"to increase the budget and resources of the [Probation Service]" the defendants

obtained "employment and promotions for individuals who were not the most

qualified, but who the defendants understood to be most politically connected"

because they had been recommended for employment (sponsored) by state

legislators (Indictment, Count One, pars. 14-16).  The defendants achieved this

through a sham hiring system involving a series of panel interviews for candidates

with scoring sheets and forms but a decision "based upon the nature and extent of

the sponsorship" (Indictment, Count One, pars. 18-19).  Rejection letters "were

routinely mailed to unsuccessful candidates after each round of interviews."

(Indictment, Count One, par. 18).  After selection Mr. O'Brien "made written

certification to the CJAM that the successful candidate had been hired in

compliance with the standards set forth in the Manual." (Indictment, Count One,

par. 18; *see also* Indictment, Count Two, par. 3).

---

[5]  For purposes of a motion to dismiss, the allegations in the indictment are
assumed to be true.  The degree of the CJAM's oversight of probation hiring,
whether compliance with the Manual was required for that hiring, and what that
Manual required in terms of hiring were all contested issues in the district court
requiring analysis of both Massachusetts statutes and case law as well as the facts.
Substantial issues addressing those allegations will also be raised on appeal.

### c. The Alleged Mailing of Rejection Letters Failed to Charge a Mailing "In Furtherance" of the Charged Scheme.

"'The federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.'" *Schmuck*, 489 U.S. at 710 (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)). While "the use of the mails need not be an essential element of the scheme but need only be 'incident to an essential part of the scheme' or 'a step in the plot.'" [6], proof that "the mails…further or assist in carrying out the scheme"[7] is an essential element of a §1341 mail fraud offense.  *See Stergios*, 659 F.3d at 132-33.

In this Indictment, the government alleged that Probation's mailing of rejection letters to unsuccessful applicants satisfied the mailing element of the §1341 charges.  Appellant argued below, and maintains here, that the connection between rejection letters and the alleged scheme is too attenuated to provide a basis for the mail fraud charges.

The Supreme Court explored the necessary connection between an alleged scheme and the use of the mails in *Schmuck*, 489 U.S. 705.  The defendant, a buyer of used cars, was accused of rolling back their odometers and selling the cars to

---

[6]  *Stergios*, 659 F.3d at 133 (quoting *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989).

[7]  *United States v. LaPlante*, 714 F.3d 641, 644 (1st Cir. 2013).

retail car dealers at prices inflated by the low mileage readings. *Id.* at 707. When

those unwitting dealers resold the cars to purchasers who relied on the falsified

odometer readings, the dealers sent a title-application form to the state department

of transportation. *Id.* Without the title, the dealer could not complete the sale to

the retail customer. *Id.* The Court held that these forms satisfied the mailing

element because Schumuck's scheme, which rested on his ability to sell cars to

dealers who could resell them, would have collapsed without the mailing of those

forms:

> Under these circumstances, we believe that a rational jury could have found
> that the title-registration mailings were part of the execution of the
> fraudulent scheme, a scheme which did not reach fruition until the retail
> dealers resold the cars and effected transfers of title. Schmuck's scheme
> would have come to an abrupt halt if the dealers either had lost faith in
> Schmuck or had not been able to resell the cars obtained from him. These
> resales and Schmuck's relationships with the retail dealers naturally
> depended on the successful passage of title among the various parties. Thus,
> although the registration-form mailings may not have contributed directly to
> the duping of either the retail dealers or the customers, they were necessary
> to the passage of title, which in turn was essential to the perpetuation of
> Schmuck's scheme.

*Id.* at 714.

 *Schmuck* distinguished three cases in which the Supreme Court had held that

mailings were not in furtherance of an alleged scheme. *Id.* at 712-14. In *Kann*, the

defendants set up a dummy corporation to funnel the proceeds of a legitimate

corporation to themselves. 323 U.S. at 90. As part of the scheme, defendants

cashed checks at local banks. *Schmuck*, 489 U.S. at 713. The government alleged

that the mailing element was satisfied because those local banks mailed the checks to the drawee banks for payment. *Id.* The Court held that these mailings were not in furtherance of the scheme because at the time the local banks mailed the checks, "[t]he scheme in each case had reached fruition. The persons intended to receive the money had received it irrevocably. It was immaterial to them, or to any consummation of the scheme, how the bank which paid or credited the check would collect from the drawee bank." *Kann*, 323 U.S. at 94.

In *Parr v. United States*, 363 U.S. 370 (1960), the defendants were charged with, *inter alia*, "the unauthorized use of a credit card issued to the school district which employed them." *Schmuck*, 489 U.S. at 713. The alleged mailing occurred when the credit card company sent a bill to the school district and when the school district mailed the credit card company payment. *Id.* The *Parr* Court, relying on *Kann*, held that these mailings were not in furtherance because the defendants' scheme was done and the defendants did not care how the credit card company collected payment. *Parr*, 363 U.S. at 393.

The defendant in *Maze v. United States*, 414 U.S. 395, 396-97 (1974), was accused of devising a scheme to defraud by stealing a credit card and using it to pay for food and lodging. The alleged mailing in furtherance occurred when the hotels sent invoices to the credit card company and the company sent a bill to the card holder. *Id.* The Court held that these mailings were not in furtherance of the

scheme because the defendant's "scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss." *Id*. at 402.

The *Schmuck* Court explained that the mailings in *Kann*, *Parr*, and *Maze* were not in furtherance of the charged schemes because they were "little more than post-fraud accounting among the potential victims of the various schemes, and the long-term success of the fraud did not turn on which of the potential victims bore the ultimate loss." *Schmuck*, 489 U.S. at 714. The Court held that *Schmuck* was different because "[t]he mailing of the title-registration forms was an essential step in the successful passage of the title to the retail purchasers" and "a failure of this passage of title would have jeopardized Schmuck's relationship of trust and goodwill with the retail dealers upon whose unwitting cooperation his scheme depended." *Id.*

The allegations in this case fit the *Kann-Parr-Maze* mold. The rejection letters alleged to be in furtherance of the scheme could not be sent until the alleged scheme had reached fruition, until the successful candidate had been hired. The Trial Court Manual relied upon in the indictment (*see* count one, par.5) states that rejection letters "should be sent after the receipt of the letter from the [CJAM] approving the appointment of the successful candidate." Trial Court Personnel Policies and Procedures §4.301(E) (version effective July 1, 1998). As in *Kann*,

15

*Parr*, and *Maze*, this mailing occurred after the alleged fraud (hiring a candidate recommended by the legislature) was completed, and was an administrative, ministerial communication to individuals who had not been hired. Unlike in *Schmuck*, these mailings had no role in preserving any relationship necessary to the alleged fraud. The mailings did not go to the CJAM, and were entirely unnecessary—had they not been sent, unsuccessful candidates would have known they did not receive the job when they were not contacted and hired.

This Court's decisions also support the conclusion that rejection letters were not in furtherance of the scheme to defraud alleged in the indictment. In *United States v. Pacheco-Ortiz*, 889 F.2d 301 (1st Cir. 1989) the alleged mail fraud arose from an insurance fraud scheme involving arson of warehouses. Reiterating that "'…[T]he focus ought to be concerned less with the precise contents of the particular mailings than with the role those mailings played in the execution of the scheme,'" this Court held that a mailing recommending settlement of the claim and a mailing requesting documents so the settlement could go forward were in furtherance of the scheme as they "clearly furthered the efforts of the cultivators of the scheme to taste the fruits of their labors." 889 F.2d at 305, 306. In contrast, the mailing of an answer to a complaint nearly three months later "made after the cultivators had enjoyed the fruits of the scheme" was not in furtherance. *Id.* at 306. *Contrast United States v. Hebshie*, 549 F.3d 30, 38-39 (1st Cir. 2008) (mail fraud

alleging scheme to defraud insurance company involving arson; insurer's letter
including reservation of rights, written during the course of defendant's efforts to
obtain payment of fraudulent claim, was in furtherance where "'incident to an
essential part' of defendant's scheme, *i.e.*, successfully navigating [company's]
claims investigation"); *United States v. Pimental*, 380 F.3d 575, 586 (1st Cir. 2004)
( mail fraud alleging scheme to defraud insurance company by lying about nature
and scope of company's work to obtain lower payments for workers' compensation
insurance; loss-control report "helped defendant maintain his ongoing fraudulent
venture by ensuring that he continued to receive insurance coverage."). In
*Pimental* this Court also stated that mailings intended to "'lull the victims into a
false sense of security, postpone their ultimate complaint to the authorities, and
therefore make the apprehension of the defendant[] *less likely* than if no mailings
had taken place'" are in furtherance of a scheme to defraud. 380 F.3d at 587-588.

In this case, the rejection letters did nothing to further the alleged scheme.
They were sent to unsuccessful job applicants, not to the CJAM,[8] after the alleged
fraud had been completed by the hiring of the successful applicant. They did
nothing to maintain a harmonious relationship between applicants and Probation.
Nor did they maintain a harmonious relationship between Probation and the
CJAM, who did not receive copies of the letters and would not have known

---

[8] The party allegedly defrauded appears to have been the CJAM. *See*
Indictment, counts three through twelve, par. 2.

whether they were received by applicants.   The letters did not provide any false sense of legitimacy or serve any lulling function.  If anything, they might have caused an applicant receiving such a letter to complain.  These letters were not in furtherance of the alleged scheme, and the mail fraud charges that rest on rejection letters should have been dismissed.

In denying the motion to dismiss, the district court  relied on two Seventh Circuit cases, *United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008) and *United States v. Fernandez*, 282 F.3d  500 (7th Cir. 2002).  *See United States v. O'Brien*, 994 F.Supp.2d  at 180.  Neither of those cases support a determination that the rejection letters here could be viewed as furthering the alleged scheme to defraud.  In *Fernandez*, the defendants were charged with a scheme to defraud a municipality and its citizenry of money and property and the honest services of two of the defendants (municipal employees) by rigging bids submitted for municipal building projects and laundering the proceeds.  A letter to a company that did not win a bid for municipal construction and a letter to the winning company, mailed after the contract was awarded, were alleged to be in furtherance of the scheme.  Rejecting the argument that the scheme ended when the bid was awarded, the court  found that it continued for another eight months as the company selected continued to receive payments from the municipality and defendants were concealing the truth about the bid rigging scheme. 282 F.3d at

18

507.  The court determined that the mailings were "essential parts of defendants' scheme"; they "furthered defendants' scheme by falsely portraying to anyone who examined [municipality] records that the bids submitted were legitimate, thereby concealing the true nature of the scheme" (282 F.3d at 508).  *Sorich*, which involved political patronage hiring in Chicago's civil service system by a group in the mayor's Office of Intergovernmental Affairs, following a federal court decree, simply cited *Fernandez* for the proposition that letters advising one applicant of rejection of a position was sufficiently connected to the hiring scheme because "the overall hiring scheme continued, and this paperwork lent a false air of propriety and regularity to the city's hiring process."  523 F.3d at 714.  Here, while alleging that rejection letters were sent and listing them as mailed in furtherance of the scheme, the indictment does not allege how they furthered the alleged scheme or that they provided any legitimacy.

### d. The Indictment Failed to Adequately Allege Deprivation of Property

Mail fraud in violation of 18 U.S.C. §1341, requires that the government establish that the defendant participated in a scheme to defraud someone of property.  *McNally v. United States*, 483 U.S. 350, 360 (1987) (§1341 is "limited in scope to the protection of property rights").  A separate statute prohibits fraud aimed at depriving someone of the intangible right of honest services, limited to

schemes involving bribery or kickbacks.  *See* 18 U.S.C. §1346; *Skilling*, --- U.S. at ---, 130 S. Ct. at 2927, 2931.

The Indictment alleges that "the defendants obtained money and property, to wit, jobs and salaries for individuals who were not the most qualified candidates." Indictment at 12-13.   This assertion fails to establish mail fraud in violation of §1341 because, based on the scheme alleged in the indictment: 1) "jobs and salaries" were not obtained as a result of the alleged scheme; and 2) any such deprivation does not involve a right to money or property. Nor does the indictment allege who was deprived of any money or property by the scheme.

### i.  The alleged scheme did not "obtain" jobs and salaries.

As set out in the AOTC Manual referenced in the Indictment, posting for the hiring of a new probation officer was done only after the decision had been made to allocate a given job and its attendant salary to Probation.  At the time funding for the slot was approved, Probation did not know who would apply, and could not have known who would ultimately be hired or what credentials that individual would have.  The Indictment did not allege any fraud in the determination of need/availability of funds process.  While the hiring process determined who would be paid that salary, the decision to pay that salary to someone had already been made.

20

The process by which Probation "obtained" the job and the process by which it assigned that job to a particular candidate are separate. The following illustrates that distinction. Assuming, as alleged in the Indictment, that the CJAM had the authority to review the Commissioner's hiring decisions, if the CJAM did not approve of the candidate chosen by Probation s/he might have insisted that the Commissioner hire a different individual, but that would not have rescinded the job opening. The mail fraud statute contemplates a scheme related to how property is obtained, not how it is allocated if it has been obtained legitimately. *See McNally*, 483 U.S. at 360-361 (noting that defendants had not been charged with depriving state of its money where they had been accused of misconduct in distributing state funds that would have been spent anyway). Here, the scheme to defraud as alleged in the Indictment involved the allocation of property that O'Brien, as a Probation administrator, had already obtained, rather than the obtaining of property. Since the Indictment did not allege a scheme to defraud that involved obtaining property the mail fraud charges should have been dismissed.

### ii. The indictment did not adequately allege deprivation of property.

The mail fraud charges also failed to sufficiently allege that anyone was deprived of property. While the Indictment does not identify whom defendants allegedly deprived of jobs and salaries, it does suggest three possible theories: 1) the defendants deprived the CJAM of jobs and salaries; 2) the defendants deprived

unsuccessful job applicants of jobs and salaries; and 3) the defendants deprived the citizens of Massachusetts of having the "most qualified" probation officers. None of these possibilities sufficed to support mail fraud charges.

The theory that the defendants deprived the CJAM of jobs and salaries could not support the mail fraud charges. As set out above, the Indictment did not allege fraud in connection with the process by which the CJAM determined that Probation could hire for a given position. Thus, the CJAM was not deprived of any jobs or salaries. At most, the CJAM was deprived of the opportunity to fully review Probation hiring decisions, an opportunity that is not a property right.[9]

Nor could the theory that the defendants deprived unsuccessful applicants of jobs and salaries support the mail fraud charges. No applicant, successful or unsuccessful, had a property right to a job in the Probation Service prior to hiring. At most, the unsuccessful applicants were deprived of a hiring process in which recommendations played no role. However, job applicants do not have a property interest in an "honestly" conducted hiring process. *See United States v. Doherty*, 867 F.2d 47, 56 (1st Cir. 1989) (holding that post-*McNally*, a mail fraud indictment could not be based on deprivation of citizens' "right to have 'promotional examinations, and law enforcement appointments and promotions, conducted

---

[9]   While for purposes of this argument, the review authority of the CJAM is assumed, this appeal will also challenge the government's assertion that the CJAM had the authority to review Probation hiring decisions as alleged in the Indictment.

honestly'" or applicants' "right to have promotions and examinations 'conducted honestly'").  *Cf. Coyne v. City of Somerville*, 972 F.2d 440 (1st Cir. 1992) (addressing alleged due process violations in promotion practices, court found school department employee had no property interest in a promotion notwithstanding facts that certification for promotion was required and plaintiff, unlike those promoted, had required certifications); *Teigen v. Renfrow*, 511 F.3d 1072, 1081 (10th Cir. 2007) (in context of assertion of due process claim to right to participate in promotion process court stated "'an entitlement to nothing but procedure cannot be the basis for a property interest.'").   Participation in a "fair" hiring process is not a property right that can support mail fraud charges.

Finally, the theory that the defendants deprived Massachusetts citizens of the "most qualified" probation officers could not support the mail fraud charges.  *See Doherty*, *supra*.  Such a deprivation sounds in intangible rights/honest services rather than property.  As this Court stated in *United States v.Ochs*, 842 F.2d 515, 527 (1st Cir. 1988), "we do not think courts are free simply to recharacterize every breach of fiduciary duty as a financial harm, and thereby to let in through the back door the very prosecution theory that the Supreme Court tossed out the front."

Moreover, at the time of the alleged conduct, the statute giving the Commissioner of Probation hiring authority read:

> Subject to appropriation, the commissioner of probation may appoint, dismiss and assign such probation officers to the several sessions of the trial court as he deems necessary.

M.G.L. c.276 §83 (version effective 2001 through 2011).  Each year between 2001 and 2010 when the legislature passed a budget and allocated funds to Probation, it restated that this money was given in part for the Commissioner to hire as he felt appropriate.  Nothing in this language required the Commissioner to hire the "most qualified" candidates, or created the expectation that such candidates would be hired.

This legal landscape is quite different from that present in cases in which courts have concluded that alleged fraud in the hiring process did constitute a deprivation of property.  In *Doherty*, the defendants were policemen accused of stealing copies of the civil service exam and selling "them to policemen so they could cheat and obtain promotions."  867 F.2d at 51.  This Court held that the indictment "validly charges a conspiracy to defraud the government of money" in stating "that it was a 'further objective of the conspiracy for the conspirators to illegally assist relatives, friends and associates in obtaining appointment to or promotion within police departments in . . . Massachusetts so that those relatives, friends and associates would receive the benefits of such appointment or promotion; which benefits included in the salary or increased salary by reason of appointment to or promotion within the police department and whatever pension

benefits would accrue by reason of the appointment to or promotion within the police department.'" *Id.* at 55-56.

Underlying this theory is the fact that the hiring and promotion of police officers was controlled by the civil service provisions of M.G.L. c.31. One of these statutes requires that police officers can only be hired and promoted "after competitive examination." M.G.L. c.31 §59. This chapter also requires the compilation of lists of individuals eligible for civil service positions based on the results of examination, and dictates how individuals can be hired from those lists. M.G.L. c.31 §§6, 27. Because of these statutes, when the legislature allocates money to a civil service agency, it has an expectation as to how hiring at that agency will proceed. In *Doherty*, the legislature had required that police officers be hired in a certain way, and the defendants personally profited from selling a stolen exam in order to subvert the legislature's dictates.

*United States v. Sorich*, 523 F.3d 702 (7th Cir. 2008), is similar to *Doherty*. In *Sorich*, the defendants worked for the mayor of Chicago and were accused of "dol[ing] out thousands of city civil service jobs based on political patronage and nepotism." 523 F.3d at 705. The government asserted that "the defendants concealed what they were doing by falsely assuring city lawyers that their hires were legitimate, and then shredding evidence and hiding their involvement once a criminal investigation began." *Id.* The Court rejected the contention that the jobs

25

at issue were not property because "the city paid for, and was cheated out of, qualified civil servants." *Id.* at 713. The court was able to assert that the city paid for qualified civil servants because "[t]his all went on despite the existence of multiple laws and personnel regulations forbidding the use of political considerations in hiring for civil service jobs, and mandating the awarding of those jobs on merit." *Id.* at 706. Those statutes enabled the legislature to expect that civil servants would be hired in a particular manner and without regard to politics.

At the time of the alleged conduct here, there was no statute or other regulation that gave the Massachusetts legislature or populace any reason to expect that probation officers would be hired in a certain manner or that those officers would be the "most qualified" under any metric. The statute in effect at the time gave the Commissioner the absolute authority to hire as he deemed fit. M.G.L. c.276 §83 (version effective 2001 through 2011). In 2011, and perhaps as a result of the allegations in this case, the legislature amended this statute to impose stringent restrictions on Probation hiring, including requiring Probation to administer a written examination to applicants, to confer with the court administrator and CJAM regarding hiring, and to not consider recommendations until after the exam and interview process. M.G.L. c.276 §83. That the legislature has passed such requirements in 2011 further indicates that earlier, in their

absence, the Commonwealth had no property right to probation officers hired in any particular way.

### 3. The Indictment Failed to Sufficiently Allege Predicate Acts Based on Violation of the Massachusetts Gratuities Statute

Count Two of the Indictment (racketeering) charged 40 predicate acts of alleged violation of the Massachusetts gratuities statute (M.G.L. c.268A §3(a)). Mr. O'Brien's motion to dismiss challenged the sufficiency of the allegations concerning those predicate acts.  His conviction was based, in part, on nine of those predicate acts alleging violation of the gratuities statute. He maintains that they should have been dismissed prior to trial.

The Massachusetts gratuities statute requires the government to prove that "something of 'substantial value' [was] given, offered, or promised to a public official 'for or because of any official act to be performed' by such public official." *Scaccia v. State Ethics Commisssion*, 431 Mass. 351, 354 (2000).  The government must prove "a link between a gratuity and an official act."  431 Mass. at 355. "[T]here must be proof of linkage to a particular official act, not merely the fact that the official was in a position to take some undefined or general action, such as holding a hearing on proposed legislation that, if passed, could benefit the giver of the gratuity."  431 Mass. at 356.  *See also United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 414 (1999), holding that a gratuities conviction under the federal statute requires proof that the alleged gift was connected to a specific

official act.  Something given just because of the public official's position or "to build a reservoir of goodwill that might ultimately affect one or more of a multitude of unspecified acts, now and in the future." (526 U.S. at 405) is not sufficient.

The Indictment here alleges, generally that jobs and promotions were given to applicants sponsored by legislators "to favorably influence and attempt to favorably influence the decisions of those legislators regarding legislative matters affecting the Probation [Service] including, but not limited to, the annual General Appropriations Act" (p.20-21, par.29) or "to favorably influence and attempt to favorably influence the decisions of those legislators regarding legislative and budget matters affecting the Probation [Service]." (p.23, par.31).  These allegations fail to link a specific hiring to a specific official act.  They describe actions taken by O'Brien and his co-defendants because of the official position of the recipients or to develop good will that could be tapped for unspecified future acts.  The failure to allege the requisite link between a particular alleged gratuity and a specific official act required dismissal of those predicate acts.

## CONCLUSION

For the reasons set forth above and the reasons set forth in the motion for release pending appeal of Elizabeth Tavares adopted above (p.7), John O'Brien

requests that this Court order him released pending appeal on the same terms and

conditions imposed for his release pending sentencing below.

Respectfully submitted,

JOHN J. O'OBRIEN
by his attorneys

 /s/ Stylianus Sinnis
Stylianus Sinnis, Esq.
William W. Fick, Esq.
Christine DeMaso, Esq.
FEDERAL PUBLIC DEFENDER OFFICE
51 Sleeper Street, 5th Floor
Boston, MA 02210
617-223-8061

## CERTIFICATE OF SERVICE

I, Stylianus Sinnis, hereby certify that on this 22nd day of December, 2014 I
caused the within Motion to be served on registered participants through its filing
with this Court's CM/ECF system.

/s/ Stylianus Sinnis
Stylianus Sinnis